

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2017

## IN RE: JAMES V., ET AL.

**Direct Appeal from the Juvenile Court for Overton County**
**No. 16-JV-23     Daryl A. Colson, Judge**

_____

### No. M2016-01575-COA-R3-PT

_____

This appeal involves the termination of a mother's parental rights to her two sons. The trial court found by clear and convincing evidence that four grounds for termination were proven and that it was in the best interest of the children to terminate parental rights. Mother appeals but only challenges the best interest determination. We have also reviewed the evidence regarding each ground for termination. We vacate the trial court's finding regarding one ground for termination but otherwise affirm the trial court's order and affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in part, Affirmed in part and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which RICHARD H. DINKINS, and THOMAS R. FRIERSON, II, JJ., joined.

Joshua Vernon Hoeppner, Kingsport, Tennessee, for the appellant, Virginia V.G.

Herbert H. Slatery III, Attorney General and Reporter, Alexanders S. Rieger, Assistnat Attorney General and Martha A. Campbell, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Virginia V.G.[1] ("Mother") gave birth to a son, James V., in December 2006. The

_____

[1]In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity. In this case, in order to preserve both clarity and the anonymity of the child, we will redact the names of individuals sharing the child's surname and will refer to those individuals by their given name and the first letter of their surname.

child was born out-of-wedlock. The Tennessee Department of Children's Services ("DCS") became involved with James in 2009 due to allegations of abandonment and nutritional neglect. Mother was released from jail around this time and admitted that she could not care for James, so DCS placed him with his grandparents. Mother gave birth to a second son ("Brother") in July 2010.[2] James remained with his grandparents until 2012, when DCS investigated the grandmother for alleged abuse of James. At that point, James was placed back in Mother's home. However, Mother's involvement with DCS continued.

Over the years, DCS conducted ten separate investigations of Mother's home. The reasons for these investigations included physical abuse, unexplained bruises on the children, environmental neglect, drug use by Mother, homelessness, and inability to establish a suitable home. DCS developed a non-custodial permanency plan for Mother that included in-home counseling, parenting education, and other services. Still, on April 21, 2015, the juvenile court adjudicated James and Brother dependent and neglected after James came to school with extensive bruising, scratches, and "slash marks" on his arm and reported that Mother "beat" him with a plastic strip off of their refrigerator. During the investigation, DCS workers observed that Mother's home was cluttered with clothes and scattered garbage. The juvenile court found that the children's safety could not be adequately protected in the home and that there was no less drastic alternative than removing the children from the home. The court granted temporary legal custody to DCS, and the children entered foster care on April 21, 2015.

DCS developed a permanency plan for Mother on May 6, 2015, which required her to complete numerous tasks to work toward the goal of returning the children to her home. Mother completed some tasks but failed to comply with many others. In December 2015, Mother's supervised visits with the children were stopped due to adverse behavioral reactions the children were experiencing in connection with the visitation, in addition to the facts that a case worker observed what appeared to be drugs during a visit to Mother's home, and Mother failed a drug screen at a visit with the children later that day.

Ten months after the children entered foster care, on March 8, 2016, DCS filed a petition to terminate Mother's parental rights based on the statutory grounds of abandonment by failure to pay child support, abandonment by failure to establish a suitable home, substantial noncompliance with the permanency plan, and persistent conditions. Counsel was appointed for Mother, and a bench trial was held on June 28, 2016. By that time, Mother was pregnant with a third child. James was nine years old, and Brother was five. The trial court heard testimony from eight witnesses presented by

---

[2]Because the second child has a very distinctive name, we will refer to him simply as Brother.

DCS, including the children's family service workers from DCS, an investigator for child protective services, various counselors, the family service coordinator who provided in-home parenting education, and an in-home case manager. Mother did not testify or call any witnesses.

On July 14, 2016, the trial court entered its written order. The court found by clear and convincing evidence that all four grounds for termination were proven and that termination of Mother's parental rights was in the best interest of the children. Mother timely filed a notice of appeal.[3]

## II. ISSUES PRESENTED

The only issue raised by Mother on appeal is whether the trial court erred in concluding that termination of parental rights was in the children's best interest. She does not challenge the trial court's findings regarding the existence of four grounds for termination. Nevertheless, we must address these issues. The Tennessee Supreme Court has stated unequivocally that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). As a result, we have reviewed the trial court's findings regarding all grounds for termination and regarding the best interest analysis. For the following reasons, we affirm the trial court's order as modified and remand for further proceedings.

## III. DISCUSSION

In Tennessee, proceedings to terminate parental rights are governed by statute. *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of a biological parent's parental rights must prove two elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.*

---

[3]On appeal, DCS notes in a footnote in its brief that "[t]he notice of appeal was not signed by Mother as required by Tenn. Code Ann. § 36-1-124(d), which became effective on July 1, 2016." DCS does not present any argument regarding this issue or suggest that the appeal should be dismissed on this basis. Accordingly, we will proceed to consider the merits of the appeal.

Because of the constitutional dimension of the rights at stake in a termination proceeding, persons seeking to terminate parental rights must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* (citing *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)). "Clear and convincing evidence" has been defined as "'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (quoting *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

Due to this heightened burden of proof in parental termination cases, on appeal we adapt our customary standard of review set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review each of the trial court's factual findings de novo in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

### 1. Grounds for Termination

### a. Abandonment by Failure to Support

The first ground for termination listed in the termination statute is abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). For purposes of terminating parental rights, there are five alternative definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i)-(v). According to the first definition, which is allegedly applicable in this case, "abandonment" means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the

parent or parents [] of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents [] either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). "Abandonment can be established by showing that a parent *either* willfully failed to visit *or* willfully failed to support" his or her child during the relevant four-month period. *In re Christopher M.*, No. W2010-01410-COA-R3-PT, 2010 WL 4273822, at *10 (Tenn. Ct. App. Nov. 1, 2010) (citing *In re Adoption of McCrone*, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003)).

"The element of willfulness is essential and central to a determination of abandonment." *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). It "is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 4, 2005). A parent's conduct must have been willful in the sense that it consisted of intentional or voluntary conduct. *In re Audrey S.*, 182 S.W.3d at 863. "To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Audrey S.*, 182 S.W.3d at 864). Whether the parent failed to visit or support the child is a question of fact, but the issue of whether the failure to visit or support constitutes willful abandonment is a question of law. *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

Because the termination petition was filed on March 8, 2016, we look to the four-month period immediately preceding that date, spanning from November 8, 2015, to March 7, 2016, in order to determine whether Mother willfully failed to support her children during that timeframe. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining the calculation of the four-month period). Beginning January 1, 2016, Mother was required by court order to pay child support in the amount of $151 per month for James and $151 per month for Brother. However, she paid no support during the pivotal four-month period or at any other point since the children entered foster care. Still, this fact alone does not establish grounds for termination of her parental rights. The determinative issue is whether her failure to pay was willful.

Defining abandonment as the mere non-payment of support, irrespective of intent,

5

would be unconstitutional. *See In re D.L.B.*, 118 S.W.3d at 367. As such, "the financial ability, or capacity, of a parent to pay support must be considered" when determining the element of willfulness. *In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *14 (Tenn. Ct. App. Sept. 22, 2016), *perm. app. denied* (Tenn. Dec. 16, 2016). The relevant statutes define the concept of willful failure to support or to make reasonable payments toward support as the willful failure to provide monetary support or "more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). By its terms, the definition of token support "requires consideration of the circumstances of the individual case." *In re K.C.*, No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *9 (Tenn. Ct. App. Oct. 4, 2005) (citing Tenn. Code Ann. § 36-1-102(1)(B)). A finding that support was "insignificant" in light of the parent's "means" cannot be made without evidence regarding both a parent's actual financial support of the child and a parent's "means." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *10 (Tenn. Ct. App. June 3, 2003); *see also In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *7 (Tenn. Ct. App. Mar. 23, 2015) (*no perm. app. filed*) ("The court must review a parent's means[.]"). "In the context of token support, the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d at 641 (citing *In re Z.J.S.*, 2003 WL 21266854, at *11 n.24; *Black's Law Dictionary* 1070 (9th ed. 2009)).

The Tennessee Supreme Court's decision in *In re Adoption of Angela E.*, 402 S.W.3d at 641, is instructive on the issue of willful failure to support. In that case, the Tennessee Supreme Court found that the petitioners failed to provide clear and convincing evidence of willful failure to support when there was no evidence presented concerning the defendant-father's monthly expenses, even though it was undisputed that he was employed as a physician earning an annual income of $150,000 and owned lien-free property worth at least $300,000. *Id.* The supreme court found the evidence regarding the father's income and expenses "limited at best" and deemed the evidence insufficient. *Id.* The court reiterated that, in order to prove the ground of abandonment for failure to support, the petitioner "must prove by clear and convincing evidence that the [parent who failed to support] had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id.* Thus, *In re Adoption of Angela E.* illustrates "the significance of evidence concerning a parent's income and expenses when the ground of abandonment by willful failure to support is alleged." *In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016).

The evidence regarding Mother's capacity to pay child support in this case is far more limited and far less convincing than the evidence presented in *In re Adoption of Angela E.* Here, the trial court found that Mother willfully failed to support the children

during the four-month period based on findings that she was "able bodied and capable of working" and "aware of [her] duty to support." The trial court found that Mother "made no attempt to support the children and [] provided no justifiable excuse for failing to support [them]." It also found that Mother had a "work history" of working as a home health care nurse and that she "worked consistently with the exception of a few weeks during the entire time the children have been in custody." Having reviewed the evidence presented and the trial court's findings, we conclude that the record contains insufficient evidence to demonstrate, clearly and convincingly, that Mother had the capacity to pay child support during the relevant period and willfully failed to do so. As noted above, Mother did not testify at trial. Regarding Mother's work history, her DCS case worker testified that she worked in the home health industry in "different jobs, but they were similar," and she testified that Mother stopped working around March 2016 due to pregnancy. The record contains no evidence regarding Mother's actual income, expenses, or resources during the relevant four-month period or at any other time. Given the issues at hand, this is a critical gap in the evidence that we cannot overlook. "Without such evidence, a finding of willfulness cannot be sustained." *In re Navada N.*, 498 S.W.3d at 600. We simply do not know whether Mother earned enough income to enable her to provide support for the children. "[A] court can only determine willfulness of a parent's failure to support where there is sufficient evidence regarding the parent's ability to pay." *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at *15 (Tenn. Ct. App. May 29, 2015), *perm. app. denied* (Tenn. Aug. 28, 2015); *see, e.g.*, *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *10 (Tenn. Ct. App. Feb. 24, 2016) (*no perm. app. filed*) ("[the] evidence concerning Mother's employment does not provide sufficient insight into her total income earned or her expenses during the relevant four-month period so as to provide clear and convincing evidence that any failure to support was willful").

The burden to prove abandonment by willful failure to support rested squarely on DCS as the petitioner. In a termination proceeding, we cannot fault a parent for the absence of evidence regarding his or her financial situation. The burden is not on the parent to demonstrate an inability to pay; the burden is on the petitioner to prove by clear and convincing evidence that the parent had the capacity to pay, made no attempt to do so, and had no justifiable excuse for not doing so. *See In re Adoption of Angela E.*, 402 S.W.3d at 641. Without basic information regarding a parent's means, we are unable to determine, by clear and convincing evidence, whether the parent had the capacity to provide support or lacked a justifiable excuse for failing to do so. Keeping in mind the heavy burden necessary to interfere with a fundamental constitutional right, the evidence offered by DCS was simply insufficient to show that Mother's failure to support her children was willful. *See In re Envy J.*, 2016 WL 5266668, at *14. Consequently, we vacate the trial court's finding regarding this ground for termination.

7

### b. Abandonment by Failure to Establish a Suitable Home

The second definition of abandonment that is relevant to this appeal provides that abandonment occurs when:

> (ii) The child has been removed from the home of the parent ... as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent or parents . . . have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tennessee Code Annotated section 36-1-102(1)(A)(ii).

For purposes of the statute, a "suitable home" means more than just an adequate physical space. *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *8 (Tenn. Ct. App. Apr. 27, 2015) (*no perm. app. filed*); *In re Malaki E.*, 2015 WL 1384652, at *9. "A suitable home for purposes of termination of parental rights is not merely a solidly built structure." *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *12 (Tenn. Ct. App. Feb. 20, 2015) (*no perm. app. filed*). A suitable home requires a safe and stable environment in which a child can live, *id.*, and "the presence of a care giver who can supply the care and attention a child needs." *In re Malaki E.*, 2015 WL 1384652, at *9. "'[A] home may be rendered unsafe and unsuitable by the conduct of its occupants.'" *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *6 (Tenn. Ct. App. Feb. 1, 2017) (quoting *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011)). For example, a suitable home must be free from drug use and violence. *In re Hannah H.*, No.

8

E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014), *perm. app. denied* (Tenn. Sept. 2, 2014).

We conclude that each of the elements of this ground was sufficiently proven in the present case. The children were removed from Mother's home through the dependency and neglect proceeding and placed in the custody of DCS. At trial, Mother's case worker testified that Mother failed to exert reasonable efforts to work with DCS during the four months after removal. She explained that DCS workers attempted to visit Mother's home on numerous occasions, and the majority of the time, Mother simply refused to open the door. Overall, the case worker was allowed inside "a few times." The case worker testified that Mother made no effort to establish a suitable home environment for the children. She described Mother's home as "completely unfit," "completely inappropriate," and "unsanitary." She said the home had clutter, garbage, and animal feces all over the floors. She testified that the DCS workers identified numerous health and safety hazards in the home and identified steps that should be taken to correct them. DCS also requested funding for rental deposits for Mother and referred her to a program for utility assistance. However, according to the case worker, Mother made absolutely no progress in improving her home environment.

Mother's issues with her home had existed for years. Even prior to the children's removal from the home, under the non-custodial plan, Mother had been provided with in-home services including parenting education instruction on how to the keep the home clean and organized. That service had been provided for a period of three years prior to removal. The in-home case manager testified that even then, the home was a mess and had a roach problem, and the children were dirty and smelled like urine and feces. Based on her experience with Mother over the course of three years, the case manager believed that Mother was not capable of keeping her house clean or creating a safe environment for her children. A family service coordinator from another center testified that she began in-home parenting education classes with Mother in 2009 and in 2012, and both times, the services ended because Mother stopped returning her calls and failed to maintain contact with the provider. She testified that Mother was "indifferent" during the in-home classes that did occur.

One week before the termination trial, the DCS case worker visited Mother's home for the last time and observed that it remained dirty, cluttered, and infested with roaches and spiders "all over the place." She saw roaches on the walls, couch, sink, and kitchen cabinets, and bug feces or something similar all over the dishes. The freezer had a very bad smell and contained moldy rotten food. Mother's home remained in this condition despite the fact that she was about seven months pregnant and not working outside the home.

9

Mother's nephew and his girlfriend were also living in the home, and they both had an extensive history with DCS dating back many years. After James was removed from the home, he reported during a forensic interview that he had endured multiple incidents of abuse by the nephew, the nephew's girlfriend's son, Mother, Mother's husband. DCS had "multiple concerns" with the nephew and his girlfriend, including drug use. Still, Mother allowed them to remain in the home and live in the children's room after the children were removed, and she became angry when DCS suggested that Mother ask them to leave. Mother's husband, who also lived in the home, had failed two drug screens as well. Mother had not failed any drug screens since she found out she was pregnant in the months before trial. Given her history, however, her case worker believed that she would still be using drugs if she was not currently pregnant.

Based on this evidence, we conclude that despite DCS's reasonable efforts to assist Mother, she failed to make reasonable efforts to provide a suitable home for the children, and she has demonstrated a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for them at an early date. We affirm the trial court's finding that this ground for termination was proven by clear and convincing evidence.

### c.    Substantial Noncompliance

The next ground for termination asserted by DCS and found by the trial court was substantial noncompliance. This ground is found in Tennessee Code Annotated section 36-1-113(g)(2) and applies when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. As we have said before,

> "[T]he requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children."

*In re Derrick J.*, No. E2015-01507-COA-R3-PT, 2016 WL 3752013, at *11 (Tenn. Ct. App. July 8, 2016) (*no perm. app. filed*) (quoting *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006)). "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that

requirement." *In re Valentine*, 79 S.W.3d at 548. The word "substantial" means "'of real worth and importance.'" *Id.* (quoting *Black's Law Dictionary* 1428 (6th ed. 1990)).

In conjunction with the determination of substantial noncompliance, the trial court must find that the requirements of the permanency plan are "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. We agree with the trial court's finding that the requirements of Mother's permanency plan were reasonable and related to remedying the conditions necessitating foster care placement. We now examine Mother's efforts to comply with those requirements.

The permanency plan required Mother to successfully complete an alcohol and drug assessment and a psychological evaluation and follow the providers' recommendations. DCS arranged for a psychological evaluation for Mother and Mother completed it, but the provider concluded that Mother was deceptive and untruthful in her responses, and therefore, no recommendations could be made. DCS then arranged funding for a second psychological evaluation with a different doctor, and again it revealed that she was untruthful. Mother's case worker testified that the same problem occurred with Mother's alcohol and drug assessment. She testified that Mother participated in "about five" alcohol and drug assessments that resulted in no recommendations because she was untruthful. Eventually, a facility used combined information from Mother's failed assessments and recommended that she attend intensive outpatient treatment. The case worker testified that Mother completed an intensive outpatient program for drugs and alcohol twice, but she tested positive two weeks after completing the first program, and she completed the second program just one week before trial. Mother had yet to complete the recommended "aftercare" program, which would include AA and NA meetings, and she had not yet demonstrated that she could maintain sobriety.

The permanency plan also required Mother to submit to drug screens and to submit to "pill counts" for prescribed narcotics. Mother passed "some" drug screens but failed others. She missed three drug screens in the two weeks before trial. Her pill counts for her prescribed oxycodone were "off" by as many as forty pills. The permanency plan required her to refrain from associating with known drug users, but all three of the people residing in Mother's home had issues with drugs, and while visiting the home, Mother's case worker observed a plate with a "crushed up white substance" and a straw.

Mother completed an "NET" program through the court (described as "a life

class") that was supposed to last 26 weeks, but it took her 13 months to complete it, and she finished just one month before trial. She participated in some anger management counseling, but her provider testified that it was not completed or successful. According to the provider, she set up an initial appointment with Mother in November 2015, but when she arrived at Mother's house, she would not answer the door, and Mother did not answer her calls thereafter. DCS arranged for a second referral to the provider in May 2016, the month before trial, for ten hours of family violence counseling. Mother participated in 9.5 hours of counseling, but the provider testified that Mother's answers in response to various proposed scenarios "were just not appropriate." Mother cancelled one appointment and was late to two others. She initially cancelled another but told the provider she decided to participate because "she realized that cancelling wouldn't look good when she goes to court for her TPR hearing next month." She also stated to the provider that she did not know why she had to participate because she did not believe she had an anger problem.

Mother was required to attend supervised visits with the children, but her visits were terminated, in part, because her case manager determined that Mother had used drugs before a visit. As noted earlier, Mother also failed to pay child support as required by the plan, refused to allow her case worker to conduct home visits, and failed to maintain a clean home as required by the permanency plan. The case worker believed that Mother "blatantly refused to cooperate."

Considering this evidence, we agree with the trial court's conclusion that clear and convincing evidence was presented to demonstrate that Mother's noncompliance with the permanency plan was substantial. She failed to demonstrate a genuine attempt to comply with the tasks in the plan. Simply "'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537. Mother failed to put forth "real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children." *In re Derrick J.*, 2016 WL 3752013, at *11 (quotation omitted).

### d. Persistent Conditions

Finally, we address the statutory ground for termination that is commonly referred to as "persistent conditions," which is defined in Tennessee Code Annotated section 36-1-113(g)(3) as existing when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in

12

all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

The purpose behind this ground for termination is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). In cases involving this ground, it is not necessary to prove that a parent-child relationship cannot be salvaged, nor is it necessary to show that a parent is currently harmful to a child's safety or emotional stability. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment. *Id.* Accordingly, the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent. *Id.* When analyzing this ground for termination, we focus on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them. *In re Audrey S.*, 182 S.W.3d at 874. Based on the evidence already discussed at length in this opinion, we agree with the trial court's conclusion that each of the elements of this ground for termination was proven by clear and convincing evidence. The children were removed from Mother's home by the requisite court order, the conditions that led to their removal and other conditions still persist and in all reasonable probability would cause the children to be subjected to further abuse and neglect, preventing a safe return to Mother's care. There is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned in the near future. And finally, continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3).

### B.    Best Interest

We now address the single issue raised by Mother on appeal – whether

termination is in the best interest of the children. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive, and the court is not required to find the existence of every factor before concluding that termination is in a child's best interest. *In re Joseph F.*, 492 S.W.3d 690, 706 (Tenn. Ct. App. 2016). On appeal, Mother argues that termination of parental rights was not in the best interest of the children because they were placed in three different foster homes in the fourteen-month period between their removal from her home and the termination trial. She argued to the trial court that termination of her rights was "premature" and that it would not harm the children to allow her an additional six months to work on the permanency plan because the children's current foster family would not be eligible to adopt them for about six months anyway. She maintains on appeal that terminating her parental rights would do nothing to "remove the stigma of being in foster care." We reject this argument, as did the trial court.

Mother fails to mention that the children were removed from their first foster home, in part, because Mother was stalking the foster family and parking near their home, which led to James being afraid of windows and overly anxious that he would be kidnapped by Mother. The second foster family earnestly desired to adopt the children until the father unexpectedly became severely ill. The children were placed with a third foster family approximately ten days before trial. This foster family worked with DCS to learn about the children's needs for about a month and met with the children prior to the move, and the case worker testified that it was "a seamless transition." She testified that the boys really like the new foster parents and that the foster parents want to adopt them.

The case worker testified that James has made a substantial amount of progress since being placed in foster care. When James entered foster care, he was in second grade but unable to read. By the time of trial, James was reading at grade-level and scoring above grade-level in math. His counselor said he had improved by "leaps and bounds." James still took medication for ADHD but was no longer in a classroom for children with behavioral problems, and he was taking less medication than when he entered foster care. The case worker testified that both children were doing very well. She said that in her eight years of experience with DCS, she had "never seen such a turnaround in children as far as behavior." She said "they are different children today than they were fourteen months ago." According to the case worker, neither child had asked to see Mother, and the children had no meaningful relationship with her.

We see no justification for allowing Mother an additional six months to work on the permanency plan. The trial judge aptly noted that Mother has caused numerous delays already by her deceptive answers to alcohol and drug assessments and psychological evaluations, indifference to counseling, and her refusal to cooperate with

14

DCS. The trial judge observed that Mother's actions were "inconsistent with a mother who wants to have her children returned." As Mother's case worker testified at trial, "we are still working on the same issues that we had on day one." She added, "these children don't . . . deserve to have to sit and wait on a parent that is continuously making the same choices over and over and over since 2009." We agree. "The child's best interests must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)). The trial judge discussed all nine of the best interest factors and ultimately concluded that "the only hope that these children have for a future is through adoption." Like the trial court, we conclude that the evidence clearly and convincingly establishes that it is in the best interest of the children for Mother's parental rights to be terminated.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the trial court is hereby vacated in part, affirmed in part, and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Virginia V.G. Because Virginia V.G. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
BRANDON O. GIBSON, JUDGE